**ST. PAUL FIRE & MARINE INSURANCE COMPANY, a corporation, Plaintiff,**

v.

**The MEDICAL PROTECTIVE COMPANY, a corporation, Defendant.**

**Civ. A. No. 78–1316.**

United States District Court, D. Kansas.

Nov. 21, 1980.

H. W. Fanning, of Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, Kan., for plaintiff.

William Tinker, of McDonald, Tinker, Skaer, Quinn & Herrington, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

KELLY, District Judge.

This matter comes on for decision now on the parties' respective motions for summary

judgment. This action is between a primary liability insurance carrier and an excess liability insurance carrier disputing the division of their respective financial responsibilities for a sizable malpractice judgment against their insureds. The issue before the Court is whether the defendant's three primary liability policies should be exhausted before the plaintiff is legally obligated to pay under its two excess liability policies. This case is in the nature of a declaratory judgment action, as stated in the pretrial order, although the plaintiff's prayer claims money damages only. An informal hearing was held in chambers on October 20, 1980, and at which time counsel argued their respective positions—the matter now ripe for disposition.

After careful consideration of the parties' briefs and the helpful oral argument of counsel, the Court hereby grants plaintiff's motion, overrules the defendant's motion, consistent with the following:

### Background

Both the plaintiff and defendant in this action, St. Paul Fire & Marine Insurance Company and The Medical Protective Company (hereinafter referred to as St. Paul and as Medical Protective), are large insurance companies. The basic facts presented in the case are undisputed. The instant lawsuit had its beginning in 1971 when a medical malpractice action was filed against Doctors Linhardt, McCoy and Kendrick, the Women's Clinic, P.A., and the Wesley Medical Center. When the 1971 malpractice action was filed Medical Protective had in force professional liability policies for each of the individual doctors named above, providing primary liability coverage with $100,000 limits on each policy. At this same time St. Paul had in force two policies of excess liability insurance for Dr. McCoy and Dr. Kendrick. Although the doctors' professional association was originally named Kendrick, Nyberg & McCoy, P.A., and is denoted as such in the five policies in question, it changed its corporate name to Women's Clinic, P.A., after the malpractice case was filed in 1971. The parties have stipu-

lated this change of corporate name is of no significance in the present case. St. Paul provided its insureds with coverage for liability in excess of $100,000 up to $1,000,000.

The medical malpractice action in state district court was eventually settled in 1977. Since Doctors McCoy and Kendrick had never rendered the plaintiffs any medical services, they were dismissed as defendants on May 26, 1977. After a settlement was agreed, judgment in the sum of $300,000 was judicially approved and entered against Wesley Medical Center on July 5, 1977. Finally, on October 24, 1977, pursuant to a settlement agreement, judgment in the sum of $400,000 was approved and entered against Dr. Linhardt and the Women's Clinic, P.A. At this time St. Paul assented to paying $300,000 of the judgment, and Medical Protective paid the remaining $100,000 upon the understanding that the two insurance companies would later litigate the issue of how the $400,000 would be divided between them. Both carriers then agreed their payments to settle the state court action would not prejudice their right to present their respective claims against each other in the present lawsuit.

The question for this Court's determination is whether the primary liability coverage provided in the two Medical Protective policies of Doctors Kendrick and McCoy should be exhausted, i. e., "stacked" on top of Dr. Linhardt's Medical Protective policy, before St. Paul became legally responsible to provide excess coverage. An affirmative answer means Medical Protective should have contributed $300,000 towards satisfaction of the 1977 malpractice judgment. In the interest of clarity, an analysis of the Medical Protective and St. Paul insurance policies is necessary:

As mentioned above, Medical Protective had issued three separate and individual policies affording primary liability coverage to the three doctors in the professional association (hereinafter Women's Clinic, P.A. and Kendrick, Nyberg and McCoy, P.A. will be referred to as the professional association unless referred to specifically). In each Medical Protective policy the individu-

al doctor was the named insured. In this regard, each Medical Protective policy also contained the following endorsement (R–1):

This policy extends to and covers [the professional association] in any claim hereunder.

As relates to who was the insured, i. e., Dr. Linhardt or the professional association—the endorsement cannot be ignored. The maximum amount payable under each Medical Protective policy was $100,000 per occurrence. When judgment was entered in the malpractice action against Dr. Linhardt and the professional association, Medical Protective paid $100,000 as compelled by Linhardt's policy (No. 479564). The endorsement extending coverage to the professional association in the Linhardt and other Medical Protective policies was incorporated in the policies when put in force and was not included as a subsequent endorsement.

The two St. Paul policies issued to McCoy and Kendrick clearly provide excess liability coverage. Each St. Paul policy also contained the following endorsement making the professional association an insured under each policy:

It is Understood and Agreed that:

1. The ... [professional association] ... is included as Named Insured under the Physicians', Surgeons' or Dentists' Professional Liability Endorsement.

Other language in the St. Paul insurance contract crucial to plaintiff's argument regards its liability limit:

III LIMIT OF LIABILITY

(a) As respects Coverage (a) [re personal and professional liability] ... [St. Paul's] ... liability shall be only for the ultimate net loss in excess of the 'underlying limits' defined as the greater of:

(1) an amount equal to the limit(s) of liability indicated beside underlying policy(ies) listed or insurance described in Schedule A herein, plus the applicable limits of any other underlying insurance collectible by the insured .... (Emphasis added.)

The significance of this section is that St. Paul would only be responsible for liability of the insured in excess of the $100,000 primary coverage provided by Medical Protective plus the maximum limits of any other collectible primary liability insurance. Schedule A of both Kendrick and McCoy's St. Paul policies listed their respective Medical Protective policies and no other professional liability policies. Dr. Linhardt had no excess coverage whatsoever.

### The Parties' Contentions

The basic contentions of the parties are simple and involve interpretation of their respective insurance contracts. St. Paul's interpretation of the Medical Protective policies is that by amendment, the professional association is an insured under each of the Medical Protective policies, and that since judgment in the malpractice case was entered against the professional association as well as Dr. Linhardt, Medical Protective should have paid $100,000 pursuant to each of its primary policies. On the other hand, Medical Protective's position is that it was only liable for $100,000 pursuant to Dr. Linhardt's Medical Protective policy and that its other two policies should not be "stacked". Medical Protective's reasoning is that the Medical Protective policies of Doctors McCoy and Kendrick are not applicable since they are not liable as employees of the professional association for Dr. Linhardt's negligence, and that consequently their individual Medical Protective policies were not triggered by the judgment against Linhardt and the professional association. The defendant also argues that under each Medical Protective policy, the professional association was only covered by virtue of the respective doctors' liability, i. e., that no additional coverage was provided the professional association by the amendment.

### Legal Discussion

Both St. Paul and Medical Protective agree the laws of Kansas govern this case. The situation presented this Court is unique. This Court's legal research has produced no cases containing facts resem-

bling those at hand. Nor have the litigants provided any. Consequently, basic contract law has been utilized to reach the Court's decision. Neither side argues any of the insurance contracts are ambiguous, and the Court agrees. "The construction and interpretation of a contract unambiguous in its terms is a question of law for the Court [case cites omitted] and the intention of the parties and the meaning of such a contract are to be deduced from the plain, general and common meaning of those terms [case cites omitted]". *Duffin v. Patrick*, 212 Kan. 772, 778, 512 P.2d 710 (1973). *See, Geier v. Eagle-Cherokee Mining Co.*, 181 Kan. 567, 313 P.2d 731; *Darby v. Keeran*, 211 Kan. 133, 505 P.2d 710 (1973). "Words cannot be written into a contract which import an intent wholly unexpressed when it was executed." *Quenzer v. Quenzer*, 225 Kan. 83, 85, 587 P.2d 880 (1978). When none of the insurance policies being examined are ambiguous, as in this case, strict construction is not appropriate. *See, Wing Mah v. U. S. Fire Ins. Co.*, 218 Kan. 583, 545 P.2d 366 (1976).

■ Since the excess coverage provided by St. Paul's policies is not triggered until Medical Protective's primary coverage is first exhausted, the Court's initial analysis is directed to the Medical Protective policies. The amendment extending coverage to the professional association in each of the Medical Protective policies is crucial and is repeated again here: "This policy extends to and covers . . . [the professional association] . . . in any claim hereunder." The most significant words here are "extends to" and "covers". The Court's research has not yielded appropriate definitions of these words by the Kansas appellate courts, and thus we look to other authorities. At 35 C.J.S. Extend p. 344 (1960) a lengthy discussion of "extend" appears:

The term is derived from 'ex,' from or out of, and 'tendere,' to stretch or stretch out, and when employed transitively, requiring an object, it is used in the sense of to stretch out or to draw out or to enlarge a thing, and implies something in existence, and something to be extended.

It is, both by etymology and by common usage, exceedingly flexible, lending itself to a great variety of meanings, which must in each case be gathered from the context owing to the fact that it is essentially a relative term, referring to something already begun, and implying its continuation; hence, in a concrete sense, it has no persistent meaning, although abstractly it always implies increase or amplification as distinguished from inception, as, for instance, to extend a man's business, or his line of credit, or the due time of his debts. (Footnotes omitted.)

Although the amendment quoted above does not specifically state the professional association is an insured under each of the Medical Protective policies, the general and common meaning of the amendment, to a reasonable person placed in the shoes of the insured doctors, would be that the amendment makes the professional association an insured under each of the three Medical Protective policies also. *See, Clayton v. Alliance Mutual Casualty Co.*, 212 Kan. 640, 646, 512 P.2d 507 (1973). As the C.J.S. quotation illustrates, "extend" is a flexible term and implies an increase, to stretch or amplication. When "extends to" is read in conjunction with "covers", which means to protect by means of insurance, Ballentine's Law Dictionary (1969), it is clear the plain meaning of the amendment makes the professional association an insured.

■ Given the Court's finding that the professional association is an insured under the three Medical Protective policies, no difficulty is encountered in finding the professional association was covered under all three when judgment was entered against it in the state malpractice action. The following is the relevant insuring clause from the Medical Protective policies:

In Consideration of the payment of the premium receipt of which is hereby acknowledged, and subject to the limits of liability and the other terms of this policy, the Company hereby agrees to DEFEND and PAY DAMAGES, in the name and on behalf of the Insured of his estate.

A. IN ANY CLAIM FOR DAMAGES, AT ANY TIME FILED, BASED ON PROFESSIONAL SERVICES RENDERED OR WHICH SHOULD HAVE BEEN RENDERED, BY THE INSURED OR ANY OTHER PERSON, IN THE PRACTICE OF THE INSURED'S PROFESSION (INCLUDING INJURY SUSTAINED BY ANY PATIENT OR ANYONE ACCOMPANYING A PATIENT WHILE IN THE INSURED'S OFFICE), DURING THE TERM OF THIS POLICY....

This clause was obviously triggered in Dr. Linhardt's Medical Protective policy by the malpractice case, because he personally rendered the professional services involved. This clause was likewise triggered in the Medical Protective policies issued to Doctors McCoy and Kendrick, because the professional association was also insured by those policies. This finding is justified, since professional services had also been rendered by the professional association, through its agent, Dr. Linhardt. In another light, the McCoy and Kendrick policies were activated by the malpractice litigation, because Dr. Linhardt was "ANY OTHER PERSON, IN THE PRACTICE OF THE INSURED'S PROFESSION".

Part A(4) of the Medical Protective policies contains the following limitation excepting Medical Protective's contractual responsibility for: "any liability growing out of services rendered by any physician or dentist regularly employed by the Insured, unless such employee is covered as an Insured of this Company". Although Dr. Linhardt was a physician regularly employed by the Insured, the professional association, he was also an "Insured of this Company" under his separate Medical Protective policy. Thus, this exception is inapplicable here.

Medical Protective argues its McCoy and Kendrick policies were not activated by Dr. Linhardt's malpractice case, because it contends the professional corporation law of Kansas, K.S.A. 17-2705 et seq. (1965), provides limited liability to the principals of the association, i. e., the three doctors. In other words, under the provisions of these statutes Doctors McCoy and Kendrick were not personally liable for Dr. Linhardt's acts.

This argument implies that Medical Protective's liability under each of its policies is triggered only by the liability of the doctor specifically named as an insured in each. This contention, of course, is not viable given the Court's holding that the professional association is made a separate insured under each policy. The fact that McCoy and Kendrick were not vicariously liable for Linhardt's negligence does not relieve the professional association from liability for the negligence of Linhardt, its agent. Consequently, a finding that the professional association was an insured under the McCoy and Kendrick policies does not abuse the professional corporation law of Kansas.

Neither is the Court moved by Medical Protective's argument that St. Paul's admission that the premium charged for its individual policies was based on the existence of $100,000 in primary coverage and not $300,000. Such parol evidence cannot be considered when a contract is clear and unambiguous. *Quenzer v. Quenzer*, 225 Kan. 83, 84, 587 P.2d 875 (1978).

Although each Medical Protective policy contains a "pro rata" type clause (condition 4, page 1) limiting its liability if the insured should have primary liability coverage with one or more additional carriers, this clause is inapplicable here because in this case only Medical Protective provided primary coverage, although concurrently in three policies. Furthermore, the judgment against Dr. Linhardt and the professional association exceeded $300,000, the combined total of the primary coverage.

As mentioned earlier, St. Paul did not issue an excess policy to Dr. Linhardt. Nevertheless, St. Paul admits some excess liability, because by endorsement the professional association was a named insured in the policies issued Doctors McCoy and Kendrick. The individual St. Paul policies provided for liability coverage above the limits of the underlying policy listed in Schedule A "plus the applicable limits of

any other underlying insurance collectible by the insured". Schedule A of each St. Paul policy listed one Medical Protective policy. Since Medical Protective is liable on its McCoy and Kendrick policies, the Court finds these two policies are "other underlying insurance collectible by the Insured", i. e., the professional association. The general rule is the excess carrier is only liable for damages above the coverage provided by all other applicable insurance. 16 Couch on Insurance 2d, p. 499 (1966, Lawyers Coop. Pub. Co.). Consequently, this Court finds Medical Protective should have been responsible for $300,000 of the $400,000 malpractice judgment, and St. Paul should have been responsible for the remaining $100,000.

The Court notes the Kansas Supreme Court has permitted "stacking" of concurrent insurance policies in the uninsured motorist context. *Welch v. Hartford Casualty Ins. Co.*, 221 Kan. 344, 559 P.2d 362 (1977). The Supreme Court's rationale was that an insured owning more than one policy paid a premium for each and thus was entitled to "stack" the applicable policies in order to obtain the total coverage possible. *Clayton v. Alliance Mutual Co.*, 212 Kan. 640 (Syl. 2), 512 P.2d 507, reh. den. 213 Kan. 84, 515 P.2d 1115. The same rationale applies here. The three Medical Protective policies may be "stacked", since the professional association paid the premium for each Medical Protective policy.

In conclusion, the Court realizes Medical Protective probably did not consider the ramifications reached in this instance, but the language of its policies nevertheless require "stacking", the professional association being an insured. Certainly, the undisclosed intent of an insurance carrier cannot prevail over the terms of the policy. *Carriers Ins. Co. v. American Home Assur. Co.*, 512 F.2d 360 (10th Cir., 1975).

For the foregoing reasons, the plaintiff, St. Paul Fire & Marine Insurance Company, is entitled to recover judgment against The Medical Protective Company, together with interest from this date. Plaintiff's claim is silent with regard to a claim for interest incurred from the date of payment in the malpractice action and, in the event the parties concur that such an amount is owing, the Court will be promptly notified and adjustments to the judgment will be made.